[Civ. No. 12106.   First Dist., Div. Two.   June 2, 1942.]

J. D. JEFFERSON et al., Respondents, v. HELEN D. TOM et al., Defendants, OSIE V. TRASK, Individually and as Administratrix with Will Annexed, etc., Appellant.

Erling S. Norby for Appellant.

Manwell & Manwell for Respondents.

STURTEVANT, J.—This is an appeal by the defendant from a judgment in favor of the plaintiffs in an action to quiet title. On the first page of her brief the defendant states two questions are involved, (1) the effect of the homestead declaration filed on the lot in dispute by the wife of the owner during his lifetime, said homestead never having been abandoned, and (2) is the wife now estopped to assert any right or interest in the lot in behalf of the estate of her deceased husband.

The plaintiffs' complaint was in the ordinary form. In her answer the defendant denied many of the allegations contained in the plaintiffs' complaint. She then alleged certain affirmative matter. She alleged that a part of the land in dispute and the improvements thereon were community property, that she had not conveyed her interest therein. She also alleged that on November 29, 1913, she filed a declaration of homestead on the land in controversy and adjoining land. The plaintiffs filed a "Reply to Answer." In that pleading they alleged an estoppel. On the issues so framed a trial was had before the trial court sitting without a jury. Later the trial court made findings and conclusions of law that were very full and complete. Among other things it found that the defendant Osie V. Trask had been guilty of laches and also that she was estopped from relying on her alleged homestead. The findings were dated the 22nd day of November, 1940, and on the same day the court entered an interlocutory decree in accordance with said findings. That decree ordered judgment in favor of the defendant if within thirty days she paid the plaintiffs $2,500, the amount of their expenditures, otherwise judgment in favor of the plaintiffs should be entered. During the period of thirty days following the date of said findings the defendant made no tender to the plaintiffs of any sum whatever and thereafter, on December 24, 1940, the trial court entered a judgment in favor of the plaintiffs which is the judgment appealed from.

The controversy between the parties arose out of the following facts. In 1902 Charles E. Seaman purchased lot 3 of block 13, range G, as shown on the official map of the city of Marysville. At that time it had on it one building. In 1911 he married the defendant. To them were born three children. During the coverture other buildings were constructed on the property. The record shows that a house of eight rooms stood on the south half at the time the conveyances hereinafter

mentioned became involved. The record shows that on the south half there were three cabins of two rooms each. On the north half stood the building which was occupied by Mr. and Mrs. Seaman and family as a residence. The record does not disclose when each building was constructed. On November 29, 1913, Mrs. Seaman, without the consent of her husband, declared a homestead on the property hereinabove described. It was dated the 29th day of November, 1913. Just when the record does not disclose, but Mr. and Mrs. Seaman became estranged. In February, 1936, she filed an action for divorce. That action was tried in May of that year. Speaking of the possession on the latter date Mrs. Seaman testified, "Yes, that was the way it was ordered through the court during the divorce proceedings. He treated the south half as his and collected the rents, and I did likewise with the north half. That continued from the time that the divorce action ended up to the time he died—until he sold it." As we understand the record P. J. Tom and Helen D. Tom, his wife (Chinese people) had been tenants of part of the property on the south half. On the 27th day of October, 1936, Charles E. Seaman deeded the south half to Helen D. Tom. Later, on August 29, 1938, Helen D. Tom and P. J. Tom conveyed the property to J. D. Jefferson and Alice Jefferson (colored people), the plaintiffs in the above entitled action. The consideration was $1,000. On February 22, 1937, Charles E. Seaman died. Thereafter Osie V. Seaman applied for letters and thereafter letters of administration with the will annexed were duly issued to her. Later she caused an inventory and appraisement to be filed. It listed as one of the properties the north half of said lot but made no mention whatever of the south half. To said inventory was annexed the affidavit of Osie V. Seaman that it contained ". . . a true statement of all the estate of said deceased." On January 18, 1938, she filed a report and petition for distribution of the estate. In said report she again included the north half of said lot. In the verification of the petition she alleged that all the statements therein were true. At the same time she filed an account which listed the north half of said lot, but no interest whatever in the south half. In the verification to said account she alleged that it was a ". . . true and correct account of all property of the estate which has come into my hands as such administratrix with the will annexed; and I do not know of any error or omission in the said account to the prejudice of any person interested in said estate." By a decree entered

on January 28, 1938, said account was approved and distribution ordered according to the prayer in the petition. On November 2, 1936, Mr. Norby testified, that as attorney for Mrs. Seaman he wrote P. J. Tom that Mrs. Seaman ". . . claims and I am certain that she can prove a community interest in this property . . . Mrs. Seaman will not join in or consent to a sale of the south half of this property for the reason that a line drawn through the center of the lot would pass through buildings which are mainly on the north half of the lot." No other objection was made.

The record does not show the date, but some time prior to the commencement of this action Osie V. Seaman married Thomas R. Trask.

After a conveyance was made to the Jeffersons they proceeded to tear down or remove the buildings which were on the land in dispute, to level the lot, and to build a cottage which cost them $2,700 as testified to by J. D. Jefferson. Before he started to tear the buildings down he talked to Mrs. Trask. She said, "When you get ready for your papers I will sign it, I won't stand in your way for a minute." That testimony was corroborated by D. Williams. He had lived on the land in dispute and was present at said conversation. Mrs. Trask never said anything more until Jefferson had a talk with her and Mr. Trask. They told him he should get the corners set "so we can have our property and you yours." Mrs. Trask told the witness to get a surveyor and she would pay her half. Jefferson employed Hugh Stone. They went to the property to make the survey. Mrs. Trask came out and showed them the corners. The survey was made. Stone testified that as Mrs. Trask showed him the corners he made no charge. Later Jefferson tore down the buildings as above mentioned and commenced the constructon of the new building. It progressed to a point where the plumbing had been installed, drainage pipe installed, some wall board put in place and some windows had been put in. In the meantime Mrs. Trask tore down the old fence and put up another about two inches on her side of the line.

The transaction between the Toms and Jeffersons was an exchange. The Jeffersons owned a property valued at $2,000. They agreed to convey it to the Toms and take in payment the property in dispute at a value of $1,000 and cash in the sum of $1,000. The transaction was handled through the Yuba Title and Guaranty Company. Mr. Phillips acted for

the company. The Toms were present and so was Judge E. P. McDaniel, former judge of Yuba County, acting as attorney for the Toms. The Jeffersons were present but were not represented by counsel. Testifying two years later as to what occurred at that time, Mr. Phillips stated that he had prepared an insurance policy protecting the Toms and delivered it, together with a deed, to the Toms. Continuing he testified that he delivered a deed to the Jeffersons but stated to them that he could not issue to them title insurance. He did not state the reason.

When the building was nearly completed the Jeffersons were compelled to go to a bank for a loan. The bank asked for an inspection of the title insurance. The title company stated it could not issue insurance until the title had been examined. J. D. Jefferson went to Mr. Norby, Mrs. Trask's attorney, and asked that Mrs. Trask execute a deed to him. Mr. Norby stated he would make the request because there had been a division of the property by the owners; that, by the division Mrs. Trask (Mrs. Seaman) became owner of the north half and Mr. Seaman became owner of the south half. Later Mr. Norby informed Jefferson she refused to sign for him and told Jefferson to call on her and see what he could do. He did so and she stated that Mr. Trask objected. He claimed he had expended funds on the south half which should be repaid.

At this time in the proceedings a bill of over $200 was due and payable to the Diamond Match Company for materials furnished. It was threatening to file a lien. Jefferson, through his attorney Mr. Manwell, applied to the title company for insurance, and paid $25 for a report. When that report was received it showed the existence of the homestead. A fair interpretation of the whole story is that the homestead as a factor was never mentioned between the parties until that report was received—some time between May 17, 1939, the date of the application therefor, and June 5, 1939, the date when the action was commenced. The record is loose, disjointed, and full of direct conflicts. At every stage of the proceedings the trial was had with the utmost care on the part of the trial judge. By reason of the conclusions set forth in the findings we assume the trial court saw the controversy as we have delineated it. ■ By its judgment it held that Mrs. Trask was guilty of laches and that she was estopped from setting up any claim under said homestead. Such holding was, we think, supported by the evidence.

In 31 C. J. S. 320, the author says: ''Where a person having a claim sees another doing an act inconsistent therewith, and stands by in such a manner as to induce the person doing the act, and who might otherwise have abstained from it, to believe that he assents to its doing, he cannot afterwards be heard to complain of it.'' In this state the rule is statutory. (Code Civ. Proc., § 1962, sub. 3.) In 10 Cal. Jur. 627, ''Estoppel,'' section 14, speaking of the doctrine it is said: ''In general, four things are essential to the application of the doctrine of equitable estoppel: first, the party to be estopped must be apprised of the facts; second, he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; third, the other party must be ignorant of the true state of facts; and fourth, he must rely upon the conduct to his injury.'' Then in section 18 it is said: ''It has been said that an estoppel in *pais* must possess an element of fraud, and that the party to be estopped must have intended to deceive, or have acted with such careless and culpable negligence as to amount to fraud.'' And, finally, in section 20 it is said: ''It is an essential element of an estoppel by conduct that the party asserting it must be ignorant of the true state of facts, and should have relied upon the representation or admission of the adverse party. If he relies upon negligence as the basis of the estoppel he must show that such negligence was the proximate cause of the deceit. He need, however, not be destitute of all possible means of knowledge of the facts, it being sufficient if he is destitute of convenient and ready means to that end.'' That the doctrine under certain circumstances is applicable to homestead rights has been held in many cases as shown by the text books. (13 R. C. L. p. 662; 29 C. J. 958.) The leading case seems to be *Grice* v. *Woodworth,* 10 Idaho 459 [80 Pac. 912, 109 Am. St. Rep. 214, 69 L. R. A. 584]. *Hainz* v. *Kurth,* 227 Wis. 260 [278 N. W. 413], is also directly in point. In *Krueger* v. *Groth,* 190 Wis. 387 [209 N. W. 772, at page 775], the Supreme Court of Wisconsin said: ''Although the constitutional and legislative provisions for such exemption have been steadfastly upheld, however far reaching the results may seem in many instances to be found in the decisions, nevertheless the right in the wife to invoke the protection of the statutes concerning the establishment of or alienation of interests in the homestead are not so absolute and unqualified

as to be beyond recognized and well-established equitable doctrine.'' After setting forth the several statutes of the State of Idaho relating to homesteads, in *Grice* v. *Woodworth*, 80 Pac. 912, at page 915, the Supreme Court of Idaho said: ''While the provisions of the sections above quoted were made for the protection of married women, they were not intended to operate as a shield to relieve them against a fraudulent transaction, such as the one under consideration, and she is estopped by her own acts from interposing the provision of said sections as a valid defense to this action.'' See, also, *Baillarge* v. *Clark*, 145 Cal. 589 [79 Pac. 268, 104 Am. St. Rep. 75]. In that case, at page 595, the court quoted from an earlier case as follows: ''These things created an equitable estoppel, because it is unconscionable for a party to permit another to so improve property obtained in such a bargain, and then claim the property and improvements, even were he to pay the costs of the improvements.''

So in the instant case we think the defendant Osie V. Trask was under the facts estopped. The letter which she caused to be sent to P. J. Tom on November 2, 1936, made no claim to a homestead. Moreover there is nothing to show that its contents were ever communicated to the Jeffersons. On the date last stated Charles E. Seaman was alive and if such claim had been made at that time it could have been refuted or the Jeffersons could have been advised and never entered into the transaction. When the Jeffersons purchased August 29, 1938, the estate of Seaman had been distributed and the defendant's claim, if any, should have been reflected in the decree of distribution. Assuming that the defendant had a color of title, she freely stated to Mr. Jefferson, ''When you get ready for your papers I will sign it. I won't stand in your way for a minute.'' At the time of the divorce proceedings some kind of a division, temporary or otherwise, was made between Mr. and Mrs. Seaman. At the time of the Jefferson survey Mrs. Seaman showed the surveyor the corners. When were those corners established—at the time of the divorce proceedings? When Jefferson entered the premises and commenced to take down the building thereon he was, under the contention of Mrs. Trask, a trespasser. However, no objection whatever was made. Under the contention of Mrs. Trask he was building on her property, nevertheless she stood by and made no objection. Conceding that Mrs. Trask had filed a declaration of homestead manifestly she knew such to be the fact at all times. Mr. Jefferson throughout contended that

he never knew of such a fact until May 17, 1939. However, as a reasonable man he had attempted to transact business through a reputable title company and was guilty of no negligence.

We find no error in the record. The judgment is affirmed.

Nourse, P. J., and Spence, J., concurred.